UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND SHAVERS,

     Plaintiff,

v.

ALMONT TOWNSHIP, *et al.*,

     Defendants.

Case No. 18-cv-12096
Hon. Matthew F. Leitman

_____/

## <u>OPINION AND ORDER GRANTING DEFENDANTS'</u><br><u>MOTION FOR SUMMARY JUDGMENT (ECF No. 11)</u>

Plaintiff Raymond Shavers owns land in Almont Township, Michigan. On November 15, 2017, Shavers submitted to the Almont Township Planning Commission (the "Planning Commission") a proposed site plan for the construction of a pole barn on his property. The Planning Commission first considered the proposed plan at its December 13, 2017, meeting and conditionally approved the plan at its March 14, 2018, meeting. The Planning Commission gave the plan final approval at its meeting on June 13, 2018, and the Township issued Shavers a building permit on June 27, 2018.

In this action, Shavers, who is African American, complains that the Planning Commission unlawfully delayed approving his plan because of his race. He insists that the delay caused him to lose a substantial business opportunity. Shavers brings

three claims against the Township under 42 U.S.C. § 1983 – for violation of the Equal Protection Clause, for violation of the Due Process Clause, and for First Amendment retaliation – and he brings a state-law gross negligence claim against the Township's Zoning Administrator. The Defendants have moved for summary judgment on all of Shavers' claims.

Shavers' concerns about racial discrimination and about the way the Township treated him are understandable. He has uncovered social media postings purportedly made by the Chair of the Planning Commission that, if authentic, suggest that the Chair may harbor racially insensitive (if not outright racist) views. Moreover, he says that the Township's Zoning Administrator gave him bad advice about whether he could begin construction without a permit and then instructed him to take the blame for her error.

But as described in detail below, Shavers has not presented sufficient evidence to support a finding that the Planning Commission delayed approving his site plan based upon his race, nor that the Zoning Administrator's erroneous advice caused any delay in the approval of his site plan. Instead, the undisputed evidence reveals that the Planning Commission's decisions to delay approval of Shavers' plan resulted from deficiencies in Shavers' site plan application documentation and from the fact that the Township's outside engineering consultant repeatedly recommended that the Planning Commission *not* approve Shavers' plan. Furthermore, there is no

evidence in the record that the Planning Commission took any adverse action against Shavers in retaliation for his statements to the Planning Commission. For these reasons and the others described below, the Court **GRANTS** the Defendants' motion for summary judgment.

## I

## A

Almont Township is a small municipality – with a population of roughly 7,000 residents – located in Lapeer County, Michigan. *See* U.S. Census Bureau, https://www.census.gov/quickfacts/almonttownshiplapeercountymichigan. The Township is governed by an elected Board of Trustees. *See Township Board Members*, Almont Township, https://www.almonttownship.org/township-board-members. It also has a Planning Commission and a Zoning Board of Appeals (the "ZBA") that each evaluate various proposed land uses within the Township. The Planning Commission is made up of seven commissioners. (*See, e.g.*, 1/10/18 Planning Commission Minutes, ECF No. 1-19, PageID.182.) Finally, the Township has an adminstratrive employee known as the Zoning Administrator, Recording Secretary, and Building Department Permit Clerk (the "Zoning Administrator"). During the relevant time frame, Defendant Ida Lloyd held that position.

Like many small municipalities, the Township does not employ full-time civil engineers or professional planners. Instead, the Township contracts with outside

professionals to provide engineering and planning advice in connection with proposed land uses. In 2017 and 2018, the Township sought engineering advice from Davis Land Surveying & Engineering, PC ("Davis Engineering"). (*See, e.g.*, 12/5/17 Mabery Shavers Plan Review, ECF No.1-14.) One of the Davis Engineering professionals who advised the Township during this time period was Corwin Mabery, PE. (*See id.*) During this same time frame, the Township sought planning advice from Rowe Professional Services Company ("Rowe"). (*See, e.g.*, 12/6/17 McGoldrick Shavers Plan Review, ECF No. 1-15.) One of the Rowe professionals who advised the Township was Caitlyn McGoldrick.[1] (*See id.*)

In 2017 and 2018, the Township's outside engineering and planning professionals played an important role in the Planning Commission's evaluation of proposed land uses. For instance, when a site plan was proposed for a new land use, Davis Engineering and Rowe would review the plan and provide detailed written reports to the Planning Commission. (*See, e.g.*, 12/5/17 Mabery Shavers Plan Review, ECF No.1-14; 12/6/17 McGoldrick Shavers Plan Review, ECF No. 1-15; 2/7/18 McGoldrick Vintech Plan Review, ECF No. 15-34; 2/8/18 Mabery Vintech Plan Review, ECF No. 15-35.) The Planning Commission would then "rely on"

---

[1] Some documents in the record, including Shavers' response brief and McGoldrick's deposition, refer to Caitlyn McGoldrick as "Caitlyn Habben." (*See* Resp., ECF No. 15, PageID.706; Habben Dep., ECF No. 15-9.) The Court uses the "McGoldrick" name here because it is the name that she used in her correspondence with the Planning Commission.

these reports when determining whether to approve or reject a proposed plan. (*See* Dep. of Steve Francis, Chair of the Planning Commission, at 23:21–24:9, ECF No. 15-8, PageID.833–834.)

## B

According to Shavers, he is the sole African American property owner in the Township. (*See* Shavers Dep. at 67:5, ECF No. 15-2, PageID.743.) Shavers operates a business on his property that takes in metal shavings, compresses the shavings into hockey puck-like objects, and delivers the pucks to a foundry for reuse. (*See id.* at 8:14, PageID.728.)

In the summer of 2017, Shavers and Daniel Hellickson, the President of AJ Metals Processing, Inc. ("AJ Metals"), reached an agreement concerning activity to take place on Shavers' property. (*See* AJ Metals Lease Proposal, ECF No. 1-6, PageID.73.) Shavers agreed to build a 10,000 square foot pole barn on his property, and AJ Metals agreed to store its industrial materials in the barn and to lease an administrative office building that was located on the property. (*See id.*) AJ Metals agreed to pay Shavers $50,000 when construction on the pole barn commenced and another $50,000 when construction ended. (*See id.*) AJ Metals also agreed to a 24-month lease of the pole barn and office space, with the lease to be "renewable annually at market price." (*Id.*) The contract between Shavers and AJ Metals was

conditioned on Shavers completing the pole barn by the first quarter of 2018. (*See* Hellickson Letter, ECF No. 15-3, PageID.759.)

After Shavers entered into the agreement with AJ Metals, he petitioned the Township to rezone his property. (*See* Shavers Dep. at 23:5–24:11, ECF No. 15-2, PageID.732.) He sought rezoning because the property initially consisted of two distinct parcels – one zoned for industrial use (on which he conducted his business) and another zoned for agricultural/residential use. (*See id.*) Shavers asked the Township to rezone the property into a single parcel approved for industrial use. (*See id.*)

On September 13, 2017, the Planning Commission unanimously recommended approval of Shavers' proposed rezoning. (*See id.* at 23:14–24; 9/13/17 Planning Commission Minutes, ECF No. 15-14, PageID.885.) Then, on October 9, 2017, the Township Board unanimously approved Shavers' petition. (*See* 10/9/17 Township Board Minutes, ECF No. 1-5, PageID.70.)

## C

After the Township Board rezoned his property, Shavers still needed to obtain site plan approval before he could proceed with the construction of his pole barn. On November 15, 2017, the Township received Shavers' Site Plan Review Application to construct the pole barn. (*See* 12/6/17 McGoldrick Shavers Site Plan Review, ECF No. 15-16, PageID.895.)

Shavers did not have a professional engineer or planning consultant prepare his site plan application. (*See* Shavers Dep. at 35:16–37:2, ECF No. 15-2, PageID.735–736.) Instead, Shavers had a professional engineer complete the site plan, and Shavers completed much of the application accompanying the plan himself. (*See id.* at 35:23–36:5, PageID.735.) The site plan and application that Shavers submitted were "missing a substantial amount of information" that is specifically required by Article 4.2 of the Township Zoning Ordinance. (12/5/17 Mabery Shavers Plan Review, ECF No. 1-14, PageID.151; *see also* 12/6/17 McGoldrick Shavers Plan Review, ECF No. 1-15, PageID.154.)

After Shavers submitted his site plan application, he had an in-person conversation with Lloyd. (*See* Shavers Dep. at 43:10–16, ECF No. 15-2, PageID.737.) Lloyd told Shavers "to get started" on construction even though the Planning Commission had not yet approved his site plan. (*Id.* at 43:11–16.) Lloyd told him that the approval process "was going to be easy-peasy and that [the site plan application] was going to fly right through." (*Id.*) In reliance on Lloyd's statements, Shavers began construction on the pole barn even though the Planning Commission had not yet approved his site plan. (*See id.* at 46:12–16, PageID.738.)

The lack of formal site plan approval soon became an issue. On or about December 6, 2017, Rick Dodge, a member of the Planning Commission, noticed the construction on Shavers' property. In an email to Lloyd that day, Dodge wrote:

Ida,

I noticed a new building being constructed on Ray Shavers property that we just re-zoned. We haven't even reviewed / approved his site plan and his large storage building already has the walls erected. How is this possible? Does he have a building permit? I see its pole construction and should require the holes to be inspected.

If I recall correctly, Mr. Shavers adjoining property has a site plan that was never completed and has expired. Is he getting any approvals from the building department or []is he just acting on his own?

Thanks,
Rick Dodge

(12/6/17 Email Chain, ECF No. 1-12, PageID.146–147.)

Later that same day, Lloyd responded:

Rick,

No one in the building department or zoning department has authorized any construction of any type to 4081 Van Dyke other than the interior renovations to the existing office building.

I will send Joe Israel out there to place a 'STOP WORK' order on anything that is unlawfully being constructed. I have also spoken to Mr. Shavers and ordered that he cease construction immediately! I have also requested that he send me an apology letter so that the Planning Comission and the Building Department will note that he took this upon himself and was not authorized by the township to begin construction. -ida

(*Id.*, PageID.146.)

At this point, Shavers did stop construction. Doing so frustrated Shavers because Lloyd's stop work order was a reversal of her earlier grant of permission to begin construction before the ground froze.[2] (*See* Shavers Dep. at 46:12–18, ECF No. 15-2, PageID.738.)

On December 7, 2017, Lloyd sent an email to several Township officials about Shavers' property. (*See* 12/7/17 Lloyd Email, ECF No. 15-13, PageID.880.) The email, addressed to Don Smith of the Almont Fire Department and copied to several other Township officials, said in relevant part that Shavers "is in deep trouble with the Township at the moment" because "he couldn't wait for approvals" before beginning construction of his pole barn. (*Id.*)

## D

With the controversy swirling over Shavers' start of construction, the Township's two outside professional consultants – engineer Mabery and planner McGoldrick – completed their evaluations of Shavers' proposed site plan. Mabery identified ten issues with Shavers' application that needed to be resolved. (*See* 12/5/17 Mabery Shavers Plan Review, ECF No. 1-14, PageID.151–152.) As noted above, Mabery highlighted that "[t]he site plan is missing a significant amount of information." (*Id.*, PageID.151.) Mabery also pointed out that the plan did not

---

[2] Lloyd contends that she never told Shavers to get a head start on construction before the ground froze. (*See* Lloyd Dep. at 44:22–25, ECF No. 15-4, PageID.785.) But for purposes of this motion, the Court must accept Shavers' testimony as true.

include the required parking calculations and grading plan. (*See id.*, PageID.151–152.)  And Mabery observed that "[t]he site currently does not drain properly and standing water can often be seen during rain events.  A detailed storm water management and detention plan is required." (*Id.*, PageID.152.)  Mabery concluded that "[t]he site plan, as submitted, does not include the required information for consideration of approval.  The information that is required may have a *significant* impact on the final layout of the site." (*Id.*; emphasis added.)  Mabery therefore did "*not* recommend approval of the plan as submitted." (*Id.*; emphasis added.)

McGoldrick's review also identified several important pieces of information that were missing from Shavers' site plan, and she raised several potential zoning compliance issues. (*See* 12/6/17 McGoldrick Shavers Plan Review, ECF No. 1-15, PageID.154–157.)  For example, McGoldrick noted that Shavers' plan was missing information about its septic field, lighting, parking spaces, utility lines, and surface drainage. (*See id.*, PageID.154–155.)  And McGoldrick identified potential zoning compliance issues with the plan's dimensions, parking, screening, landscaping, and lighting. (*See id.*, PageID.155–156.)  McGoldrick did not make a recommendation as to whether the Planning Commission should approve or reject Shavers' proposed site plan.  But she did "remind the Planning Commission of its authority to waive any information they determine unnecessary to verify compliance with the [zoning] ordinance." (*Id.*, PageID.154.)

The Planning Commission formally considered Shavers' site plan for the first time at a meeting on December 13, 2017. (*See* 12/13/17 Planning Commission Minutes, ECF No. 1-16.) Prior to the meeting, Lloyd directed Shavers to write a letter to the Planning Commission apologizing for starting construction without a permit (*see* Lloyd Dep. at 54:24–55:6, ECF No. 15-4, PageID.795–796), and Shavers did so. (*See* 12/11/17 Shavers Apology Letter, ECF No. 1-13.) Lloyd had never asked any other person with business before the Planning Commission to write an apology letter. (*See* Lloyd Dep. at 55:16–19, ECF No. 15-4, PageID.796.)

At the December 13, 2017, Planning Commission meeting, Shavers again apologized for starting construction before receiving site plan approval. (*See* 12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.) He explained that he began construction because he wanted to start the project before the weather turned colder. (*See id.*) Shavers did not tell the Planning Commission that Lloyd had authorized him to begin construction before his site plan was approved. (*See* Compl. ¶ 48, ECF No. 1, PageID.12.) Instead, the evidence indicates that he accepted blame for the premature commencement of construction. (*See* 12/11/17 Shavers Apology Letter, ECF No. 1-13, PageID.149; 12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.) Upon hearing Shavers' apology, the Planning Commissioners "expressed their displeasure" at Shavers'

commencement of construction without site plan approval. (12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.)

Consistent with Mabery's recommendation, the Planning Commission did not approve Shavers' proposed site plan. Instead, the Planning Commission asked Shavers to review Mabery's and McGoldrick's assessments of his plan, to revise his plan to address the concerns raised by those consultants, and to submit a new revised plan to Mabery and McGoldrick by December 27, 2017. (*See id.*, PageID.171.) The Planning Commission planned to place Shavers' revised plan on the agenda for its next scheduled meeting on January 10, 2018. (*See id.*)

## E

Shavers submitted a revised site plan to Mabery and McGoldrick on December 26, 2017. (*See* 1/3/18 McGoldrick Shavers Plan Review, ECF No. 1-17, PageID.173.) McGoldrick issued her review on January 3, 2018. (*See id.*) McGoldrick noted that 10 items had been addressed and 17 items remained outstanding. (*See id.*, PageID.173–176.) Mabery issued his review on January 4, 2018. (*See* 1/4/18 Mabery Shavers Plan Review, ECF No. 1-18.) Mabery identified 16 items that needed to be addressed and again did "*not* recommend approval of the plan as submitted." (*Id.*, PageID.178–180; emphasis added.)

The Planning Commission next considered Shavers' application at its January 10, 2018, meeting. (*See* 1/10/18 Planning Commission Minutes, ECF No. 1-19.)

Shavers brought his engineer, Tammy Foster of Ziemnick Foster Engineering, LLC, to that meeting so that she could address the issues that Mabery and McGoldrick had previously raised with Shavers' plan. (*See id.*, PageID.183.) Several of Shavers' neighbors also attended the meeting and expressed their "disapproval" of where the pole barn was to be situated on Shavers' property. (*Id.*) The discussion at the meeting eventually turned to the issue of which portion of Shavers' property was to be designated as the "frontage." (*Id.*, PageID.184.) The members of the Planning Commission could not reach a consensus on the frontage issue, and at that point Mabery suggested that the Planning Commission refer the question to the ZBA for resolution. (*See id.*) The Planning Commission "agreed" with Mabery's recommendation and referred Shavers' application to the ZBA for consideration of the frontage issue and of whether certain zoning variances were required before Shavers could resume construction. (*Id.*)

Over the next week, Foster and Timothy Denney, Shavers' attorney, corresponded with the Township and contended that Shavers did not need any zoning variances from the ZBA. (*See* 1/11/18 Foster Letter, ECF No. 1-20; 1/16/18 Denney Email, ECF No. 1-21.) McGoldrick agreed with Foster and Denney that the frontage issue did not require a variance. (*See* 1/16/17 Email Chain, ECF No. 1-22.) It appears that the Planning Commission was persuaded that Shavers did not need to obtain a variance to address the frontage issue. Shavers has not identified evidence

in the record that the Planning Commission ever raised the frontage issue again or actually required Shavers to obtain a variance for the frontage.

## F

Shavers submitted another revised version of his site plan on January 23, 2018. (*See* 2/7/18 McGoldrick Shavers Plan Review, ECF No. 1-25, PageID.213.) Mabery and McGoldrick then issued their reviews of that plan. In Mabery's review, he acknowledged that Shavers' "revised plans have provided much of the information requested in our previous site plan review," but Mabery identified 11 issues that still needed to be addressed. (*See* 2/5/18 Mabery Shavers Plan Review, ECF No. 1-24, PageID.209–211.) In particular, Mabery emphasized that "the plans must be revised to provide a surface water control plan that includes adequate detention/retention areas and limits the surface water runoff to the adjacent properties." (*Id.*, PageID.211.) In light of the open issues, Mabery again did "*not* recommend engineering approval of the plan as submitted." (*Id.*; emphasis added.) In McGoldrick's review, she listed 14 items as addressed and 13 items as outstanding. (*See* 2/7/18 McGoldrick Shavers Plan Review, ECF No. 1-25, PageID.213–215.) McGoldrick's review again informed the Planning Commission "of its authority to waive any information they determine unnecessary to verify compliance with the [Zoning] Ordinance." (*Id.*, PageID.213.)

The Planning Commission took up Shavers' revised site plan application at its February 14, 2018, meeting. (*See* 2/14/18 Planning Commission Minutes, ECF No. 1-27, PageID.223.) The Planning Commission discussed the written evaluations of that plan from McGoldrick and from Mabery – in which, as noted above, Mabery recommened against approving the site plan.[3] (*See id.*) The Planning Commission decided to postpone a decision on Shavers' plan until he addressed the issues identified in Mabery's and McGoldrick's latest reviews. (*See id.*, PageID.224.)

## G

Shavers again revised his site plan, and on March 5, 2018, Mabery issued a another review of Shavers' again-revised plan. (*See* 3/5/18 Mabery Shavers Plan Review, ECF No. 1-29, PageID.230.) Mabery said that additional information was still required regarding Shavers' pump discharge system for storm water, and he noted that Shavers should describe his intentions for a house located on the property (which had been rezoned for industrial use). (*See id.*) But this time, Mabery "recommend[ed] engineering approval contingent on [these] items being addressed to the satisfaction of the Township." (*Id.*) McGoldrick issued her review of Shavers'

---

[3] It appears that the Planning Commission did not receive the written reviews by McGoldrick and Mabery as far in advance of the February 14, 2018, meeting as the Planning Commission would have preferred. (*See* 2/14/18 Planning Commission Minutes, ECF No. 1-27, PageID.223.) However, the meeting minutes indicate that the Planning Commission members were aware of the substance of the reviews when discussing Shavers' proposed plan at the meeting. (*See id.*)

again-revised plan on March 6, 2018. (*See* 3/6/18 McGoldrick Shavers Plan Review, ECF No. 1-30.) McGoldrick listed 10 items as addressed and only 1 item as outstanding – a soil boring report, which McGoldrick recommended be waived because there was already an existing building on Shavers' property. (*See id.*, PageID.231–232.)

On March 14, 2018, the Planning Commission followed Mabery's recommendation and voted to approve Shavers' application contingent upon Shavers addressing the storm water discharge issue to Mabery's satisfaction. (*See* 3/14/18 Planning Commission Minutes, ECF No. 1-31, PageID.237.) Five commissioners voted in favor of the plan; only Commissioner Bryan Zender voted against approval. (*See id.*)

Shavers resolved the storm water discharge issue on May 16, 2018. (*See* 5/16/18 Engineering Board of Appeals Minutes, ECF No. 1-37, PageID.251–253.) At the Planning Commission's next meeting on June 13, 2018, Mabery recommended that the Planning Commission provide final approval for Shavers' site plan. (*See* 6/13/18 Planning Commission Minutes, ECF No. 15-31, PageID.981.) The Planning Commission followed Mabery's recommendation and gave final approval to the site plan at that meeting. (*See id.*) The final vote was 4–1 in Shavers' favor. (*See id.*)

On June 27, 2018, the Township issued Shavers a building permit to construct his pole barn. (*See* Building Permit, ECF No. 1-48.)

**H**

Shavers filed this action on July 5, 2018. (*See* Compl., ECF No. 1.[4]) Shavers' Complaint seeks $3,000,000 in damages plus fees, costs, and interest. (*See id.*, PageID.47.) Shavers alleges that he was harmed by the "numerous delays imposed by the Township." (*Id.*, PageID.35.) According to Shavers, the "ongoing, months-long delays Mr. Shavers encountered with Township officials . . . prevented him from obtaining the requisite approvals to construct the pole building in a timely manner." (*Id.* ¶ 97, PageID.35.) Shavers therefore was unable to construct and deliver the facilities to AJ Materials by the first quarter of 2018 as required by their agreement. (*See id.*) "As a result, AJ Metals withdrew from any further lease negotiations with Mr. Shavers," and "[n]o lease agreement was ever finalized between Mr. Shavers and AJ Metals." (*Id.* ¶¶ 198–199, PageID.36.) Without a finalized lease agreement, AJ Metals never paid Shavers $100,000 total to construct the barn or the additional yearly lease payments. (*See id.* ¶ 200.) In addition to losing the contract with AJ Metals and that business expectancy, Shavers claims that the Township "put[] him in harm's way and subject[ed] him to vitriolic racial

---

[4] Shavers' Complaint is labeled as a "Verified Complaint" and contains a verification page, but it is not, in fact, verified. (*See* Compl., ECF No. 1, PageID.48.)

discrimination that has resulted in his requiring continued medical treatment." (*Id.* ¶ 202, PageID.37.)

Shavers brings three claims under 42 U.S.C. § 1983. First, Shavers alleges that the Township violated the Equal Protection Clause of the Fourteenth Amendment.[5] (*See id.* ¶¶ 204–214, PageID.39–41.) Shavers brings this as a "class of one" equal protection claim. (*Id.*) Shavers alleges that the Township "unnecessarily, unreasonably and intentionally interfered with and delayed Mr. Shavers' efforts to obtain the requisite Township approvals in order to construct a new pole barn on his Property because they had personal animus again[st] [Shavers], based upon his race as a successful African American businessman." (*Id.* ¶ 208, PageID.39–40.) And Shavers says that the Township "gave permits to other similarly situated Caucasian land use applicants." (*Id.* ¶ 209, PageID.40.) "In doing so," Shavers argues, the Township "intentionally treated Plaintiff differently from

_____

[5] Shavers at times refers to "Defendants" plural in his equal protection, due process, and First Amendment claims. (*See, e.g.*, Compl. ¶ 208, ECF No. 1, PageID.39–40.) At other times in those claims, he refers to "Defendant" singular and to the Township. (*See, e.g.*, *id.* ¶ 209, PageID.40.) The Court understands these claims to be asserted against the Township only because, at bottom, the claims challenge the decisions of the Planning Commission to delay approval of Shavers' site plan and to do so, in part, based upon Shavers' protected speech. Further, Shavers' brief does not appear to argue that Lloyd was separately responsible for these alleged constitutional violations. (*See* Resp., ECF No. 15, PageID.704–720.) But even if the claims are against Lloyd as well, the Court's decision on the motion for summary judgment would not change.

those similarly situated and there is no rational basis for the differential treatment." (*Id.* ¶ 210.)

Second, Shavers alleges that the Township violated the First Amendment by retaliating against him for "complain[ing] of the unequal treatment he was receiving by the Township and its zoning administrator." (*See id.* ¶¶ 215–224, PageID.41–42.) According to Shavers, after he "challeng[ed]" the "racist and illegal decisions made at the Planning Commission," the Township responded by "caus[ing] the Plaintiff to suffer an injury that would be likely to chill a person of ordinary fitness when continuing to engage in that activity." (*Id.* ¶¶ 219–220.)

Third, Shavers alleges that the Township violated his substantive due process rights under the Due Process Clause of the Fourteenth Amendment. (*See id.* ¶¶ 225–234, PageID.43–44.) Shavers alleges that the Township subjected him to "arbitrary or irrational zoning decisions" and "arbitrarily and capriciously deprived" him of his property and liberty interests. (*Id.* ¶¶ 228–232.)

Finally, Shavers brings a state-law gross negligence claim against Defendant Lloyd. (*See id.* ¶¶ 235–247, PageID.45–47.) According to Shavers, "Lloyd's conduct was the most immediate, efficient and direct cause of the injury or damage to Plaintiff." (*Id.* ¶ 238, PageID.45.) Shavers alleges that Lloyd "intentionally and wrongfully interfered with [the] business relationship and expectancy between Plaintiff and AJ Metals by causing unnecessary, unreasonable and intentional delays

in Mr. Shavers' efforts to obtain the requisite Township approvals in order to construct the proposed new pole barn structure on the Property." (*Id.* ¶ 243, PageID.46.)

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

# III

## A

The Court starts with Shavers' equal protection claim. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause is "essentially a direction that all persons similarly situated should be treated alike." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

When reviewing state action challenged under the Equal Protection Clause, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The most "exacting" tier, strict scrutiny, is reserved for "classifications based on race or national origin and classifications affecting fundamental rights." *Id.* (citations omitted). "Under strict scrutiny," a classification "will only be upheld if it is narrowly tailored to serve a compelling state interest." *Dubay v. Wells*, 506 F.3d 422, 429 (6th Cir. 2007). A less exacting but still heightened tier of scrutiny is intermediate scrutiny, "which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Clark*, 486 U.S. at 461. "To withstand intermediate scrutiny," a classification "must be substantially related to an important governmental objective." *Id.* The least exacting

tier is rational basis review, which applies if the government action "does not impair the interests of members of any suspect or quasi-suspect class." *Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292 n.1 (6th Cir. 1997). Under rational basis review, government action "is presumed to be valid," *City of Cleburne*, 473 U.S. at 440, and the plaintiff must demonstrate that the challenged action "is not rationally related to a legitimate government purpose." *Dubay*, 506 F.3d at 429.

While Shavers repeatedly contends that the Planning Commission discriminated against him based upon his race – which is a suspect classification triggering strict scrutiny review under the Equal Protection Clause – he does not ask the Court to apply strict scrutiny to any of the Planning Commission's decisions or actions. Instead, Shavers brings what is known as a "class of one" claim – a claim involving the lowest level of equal protection scrutiny for challenged state actions. In this type of claim, "the plaintiff alleges that the state treated [him] differently from others similarly situated and that there is no rational basis for such difference in treatment." *EJS Props.*, 698 F.3d at 864. To prevail, the plaintiff "must show that (1) the government treated [the plaintiff] differently from a similarly situated party, and (2) the government had no rational basis to do so." *Id.* For the first prong, "[w]hen evaluating whether parties are similarly situated, 'courts should not demand exact correlation, but should instead seek relevant similarity.'" *Id.* at 864–65. For

the second prong, "a plaintiff can establish the lack of a rational basis if it either (1) negates every conceivable basis which might support the government action or (2) demonstrates that the challenged government action was motivated by animus or ill-will." *Id.* at 865 (alterations and quotation marks omitted) (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)).

## 1

Shavers attempts to satisfy the first prong of his equal protection claim by identifying similarly situated Caucasian land owners who were treated differently by the Township. Shavers focuses primarily upon the Planning Commission's treatment of Vintech, a Caucasian-owned business in the Township. Like Shavers, the owners of Vintech asked the Planning Commission to approve construction of a 10,000 square foot pole barn (essentially the same structure that Shavers sought to build). (*See* Dep. of Joe Israel, Township Building Inspector, at 52:2–8, ECF No. 15-11, PageID.870; 2/8/18 Mabery Vintech Plan Review, ECF No. 15-35, PageID.1005.) And, as with Shavers' proposed plan, the Planning Commission's engineering and planning professionals – Mabery and McGoldrick – identified several concerns with Vintech's proposed plan. (*See* 2/7/18 McGoldrick Vintech Plan Review, ECF No. 15-34; 2/8/18 Mabery Vintech Plan Review, ECF No. 15-35.) Yet, the Planning Commission approved Vintech's plan the first time that it appeared on the Planning Commission's agenda; the Planning Commission did not

extend consideration of Vintech's plan over several meetings as it did with Shavers' plan. There is certainly some force to Shavers' argument that Vintech was similarly situated to him and that the Planning Commission treated him differently.

But, as the Township reasonably counters, there are also some potentially important differences between Shavers and Vintech. For instance, Shavers' initial proposed site plan omitted a substantial amount of required information (*see* 12/5/17 Mabery Shavers Plan Review, ECF No. 1-14, PageID.151–152), but there is no indication in the record that Vintech's proposed plan lacked such essential information. Likewise, engineering consultant Mabery recommended that the Planning Commission approve Vintech's proposed plan the first time it appeared on the Planning Commission's agenda (because he deemed that the issues with the plan were not significant), but he repeatedly recommended that the Planning Commission not approve Shavers' plan (because he did deem the issues with Shavers' plan to be significant). Thus, Vintech's plan and Shavers' plan came before the Planning Commission (1) in different states of completeness and (2) with different recommendations from Mabery. These differences may materially distinguish Vintech's circumstances from Shavers' circumstances.

The Court need not resolve – and does not resolve – the difficult question of whether Shavers' site plan application was similarly situated to Vintech's application. That is because, as described below, Shavers has failed to satisfy the

second element of his "class of one" claim, and thus Defendants would be entitled to summary judgment even if Shavers and Vintech were similarly situated.[6]

## 2

Shavers' "class of one" claim fails as a matter of law because he has failed to present sufficient evidence that the Planning Commission "had no rational basis" to delay approval of his site plan application while approving Vintech's application. *EJS Props.*, 698 F.3d at 864. Shavers could have shown a lack of rational basis by "(1) negat[ing] every conceivable basis which might support the government action or (2) demonstrat[ing] that the challenged government action was motivated by

---

[6] Shavers also contends that he was similarly situated to two other Caucasian-owned businesses: Novak's Supply & Equipment and The Country Smoke House. But there seem to be material differences between Shavers and those entities. For instance, Novak's never submitted a site plan application to the Planning Commission nor applied for a building permit. (*See* Israel Dep. at 64:21–66:1, ECF No. 15-11, PageID.873–874.) Instead, Novak's went ahead and built its structure without permission, and the Township did not learn about that improper construction until it had been completed. (*See id.*) Thus, Novak's did not participate in the same approval process before the Planning Commission that Shavers participated in. Indeed, it is not clear that the Planning Commission – the entity that allegedly harmed Shavers – had any authority to take any action against Novak's once the Township discovered Novak's completed construction. Moreover, Novak's building was "less" than 2,500 square feet, or less than a quarter the size of Shavers' 10,000 square foot barn. (*See id.* at 66:24–67:1, PageID.874.) Next, while Shavers claims generally that the Township ignored code violations by The Country Smoke House, he has not presented evidence of the specific alleged violations by the Smoke House, nor has he shown that the Smoke House was similarly situated before the Planning Commission. But, as with Vintech, the Court need not – and does not – decide whether Shavers was similarly situated to Novak's and The Country Smoke House because the Township is entitled to summary judgment even if he is so situated.

animus or ill-will." *Id.* at 865 (alterations omitted) (quoting *Warren*, 411 F.3d at 711). He did neither.

**a**

Shavers has not negated every conceivable basis supporting the Planning Commission's decision to treat him differently than Vintech – i.e., for delaying approval of his plan while approving Vintech's plan the first time it appeared on the agenda. That differential treatment tracked the professional advice from Mabery. Mabery recommended that the Planning Commission approve Vintech's proposed site plan the first time it came before the Planning Commission because the issues that he identified with the plan were, in his professional judgment, not significant enough to justify denial of the plan. (*See* 2/8/18 Mabery Vintech Plan Review, ECF No. 15-35, PageID.1005–1006.) In sharp contrast, Mabery recommended that the Planning Commission delay approval of Shavers' plan the first time it appeared on the agenda because it was missing a substantial amount of required information and because, in his professional judgment, the significant concerns he raised about the plan warranted delaying approval. Thereafter, Mabery continued to recommend that the Planning Commission not approve Shavers' plan because, in his professional judgment, outstanding issues remained that made approval inappropriate.[7] Mabery's

---

[7] As explained above, at the Planning Commission's meeting on January 10, 2018, the Planning Commission delayed a vote on Shavers' site plan due to uncertainty about the frontage of the property. (*See* 1/10/18 Planning Commission Minutes, ECF

professional opinions may have been open to reasonable dispute, but Shavers has not shown that it was irrational for the Planning Commission to rely upon those opinions when considering Shavers' and Vintech's site plan applications. Moreover, Shavers has neither argued, nor directed the Court to evidence that, Mabery was anything other than a neutral and objective professional consultant who discharged his duties in good faith.

Shavers has not cited any case in which a court has found that a municipal body lacked a rational basis for an action that was consistent with the recommendations of its retained professionals. And the Sixth Circuit has found differential treatment by a municipality to be rational where, among other things, it

---

No. 1-19, PageID.184.) The Planning Commission referred the frontage matter to the ZBA at Mabery's suggestion. (*See id.*) Moreover, before the January 10, 2018, Planning Commission meeting, Mabery had recommended against approving the version of the plan that was before the Planning Commission at the meeting. (*See* 1/4/18 Mabery Shavers Plan Review, ECF No. 1-18, PageID.178.) Thus, the Planning Commission's decision not to vote to approve Shavers' site plan at its meeting on January 10, 2018, was supported by (1) Mabery's suggestion of a referral to the ZBA and (2) Mabery's recommendation that the Planning Commission not approve the pending version of the plan. While Shavers complains that the frontage questions raised by the Planning Commission were illegitimate and resulted in further delays (*see* Resp., ECF No. 15, PageID.703–704, 718), there is no reason to believe that if the frontage issues had not arisen, the Planning Commission would have approved his plan – over the contrary recommendation of Mabery – at its January 10, 2018, meeting. Indeed, Mabery recommended against approving Shavers' site plan at the next Planning Commission meeting on February 14, 2018, and the Planning Commission followed that recommendation. (*See* 2/5/18 Mabery Shavers Plan Review, ECF No. 1-24, PageID.209–211; 2/14/18 Planning Commission Minutes, ECF No. 1-27, PageID.223–224.)

was "influenced by recommendations" from individuals and entities with relevant expertise. *See TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005). For all of these reasons, Shavers has failed to show that the Planning Commission acted irrationally when it followed Mabery's recommendation to treat Shavers and Vintech differently.

Shavers counters with two arguments. First, he contends that the Planning Commission's retained professionals "do not give the Planning Commission recommendations as to approving or denying site plans." (Resp., ECF No. 15, PageID.699, 702.) As support for this argument, Shavers cites only McGoldrick's testimony that "she was never asked" to provide such a recommendation. (*Id.*, PageID.699; citing Habben Dep. at 25:4–6, ECF No. 15-9, PageID.845.[8]) But Shavers ignores the undisputed fact that Mabery repeatedly made approval and denial recommendations – and that he specifically did so with respect to Shavers' site plan and Vintech's proposed site plan. (*See, e.g.*, 12/5/17 Mabery Shavers Plan Review, ECF No. 1-14, PageID.152; 2/8/18 Mabery Vintech Plan Review, ECF No. 15-35, PageID.1005.) Thus, Shavers errs when he contends that the Planning Commission did not receive approval/denial recommendations from a retained professional.

---

[8] The Court notes again that it refers to the Township's planner as "McGoldrick" rather than "Habben" because she used the "McGoldrick" name for her correspondence with the Township.

Second, Shavers contends that the Planning Commission did not rely on the advice of its professionals in determining whether to approve or deny a proposed site plan. (*See* Resp., ECF No. 15, PageID.702–703.) The evidence says otherwise. Planning Commission Chair Steve Francis testified that the Planning Commission does rely on the advice from its professionals to identify "issues" and "concerns" that might warrant denial of site plan approval. (Francis Dep. at 23:21–24:9, ECF No. 15-8, PageID.833–834.) And the Planning Commission followed every one of Mabery's recommendations about whether to approve or deny Shavers' and Vintech's applications.

Shavers counters with one example in which the Planning Commission required an applicant to submit topographic materials even though Mabery opined that the materials were not necessary. (*See* Resp., ECF No. 15, PageID.702–703; citing 6/13/18 Planning Commission Minutes, ECF No. 15-31, PageID.980.) For several reasons, this example does not meaningfully support Shavers' contention that the Planning Commission does not follow the recommendations of its professionals. First, it is not clear that Mabery performed his usual formal review of the plan in question. The meeting minutes cited by Shavers indicate that Mabery "stepp[ed] away" during the discussion of the plan because "his company had surveyed the property in question." (6/13/18 Planning Commission Minutes, ECF No. 15-31, PageID.980.) Second, the minutes indicate that Mabery made

"comments . . . to [McGoldrick's] report," and they do not indicate that Mabery prepared his own report. (*Id.*)  Third (and most importantly), the example cited by Shavers is not one in which the Planning Commission disregarded Mabery's recommendation on the fundamental question of whether to approve or deny a plan. Instead, it is (at most) an example of the Planning Commission wanting to review more information than Mabery thought necessary.  The example does not support Shavers' contention that the Planning Commission's claimed reliance on the advice of its professionals is a bad faith "Nuremberg defense." (Resp., ECF No. 15, PageID.699–700.)  And the Planning Commission's reliance on that advice to delay approval of Shavers' plan was rational.

**b**

Shavers has also failed to demonstrate that the Planning Commission's delay in approving his site plan was "motivated by animus or ill-will." *EJS Props.*, 698 F.3d at 865.  "Animus" is "ill will, antagonism, or hostility usually controlled but deep-seated and sometimes virulent," and "ill will" is an "unfriendly feeling: animosity, hostility." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 466 (6th Cir. 2012) (quoting Webster's Third New International Dictionary, Unabridged (2002)). Shavers has shown neither.

Shavers contends that he has shown "animus through the email of Lloyd" in which she wrote that Shavers "is in deep trouble with the Township at this moment."

(Resp., ECF No. 15, PageID.713; citing 12/7/17 Lloyd Email, ECF No. 15-13, PageID.880.) But Shavers' "trouble" with the Township does not amount to the required "animus" for several reasons. First, to the extent that the "trouble" was with elements of the Township other than the Planning Commission, it is not relevant because the Planning Commission, not others in the Township, delayed Shavers' site plan approval.[9] Second, to the extent that Shavers' "trouble" was with the Planning Commission, that "trouble" stemmed directly from Shavers' own admissions to the Planning Commission that he began to construct his pole barn without the required site plan approval. (*See* 12/11/17 Shavers Apology Letter, ECF No. 1-13; 12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.) That the Planning Commission felt – and expressed – "displeasure" with Shavers for his admitted violations of the Building Code is neither surprising nor evidence of animus. (12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.) Third, there is no evidence that the Planning Commission's frustration with Shavers' premature start of construction influenced any of the Planning Commission's decisions to delay approval of his site plan. The Planning Commission voiced its frustration about the construction-start issue only once – when Shavers' site plan first appeared on its agenda. And it declined to approve the plan that day because it was missing

---

[9] As explained below, while Shavers contends that Lloyd's actions delayed approval of his site plan, he has not presented sufficient evidence to support such a finding. *See infra* Section III.D.

important information and because Mabery recommended against approval. For all of these reasons, that Shavers was initially "in deep trouble" for his premature start of construction is not evidence that the Planning Commission's delay in approving his site plan was "motivated by animus or ill-will." *EJS Props.*, 698 F.3d at 865.

Next, Shavers says that he has shown "animus" by presenting evidence that Francis, the Chair of the Planning Commission, "is a racist" and that Francis led the "charge" against Shavers. (Resp., ECF No. 15, PageID.695, 713.) In support of this contention, Shavers has submitted what purport to be social media postings by Francis that contain disparaging comments about, and images related to, African Americans. (*See id.*, PageID.695.) The images submitted by Shavers, if authentic,[10] are, indeed, disturbing and may fairly be characterized as reflecting (at an absolute minimum) that Francis harbors racially insensitive views. But for at least two reasons, the purported evidence of Francis' attitudes about race is not enough to support a finding that the Planning Commission's decisions on Shavers' site plan were infected by racial animus.

First, Francis is only one member of the Planning Commission. There is no evidence that any other Planning Commission members harbored racially insensitive

---

[10] Shavers has inserted the images into his response brief, but he does not cite any evidence that could support a finding that the images actually appeared on Francis' social media account(s). Nor has Shavers directed the Court to any deposition testimony by Francis concerning the images.

or racist views. And the Planning Commission's decision to delay approval of Shavers' site plan would have been the same even if Francis' allegedly tainted vote is discarded. Thus, even if Shavers could establish that racial animus drove Francis' votes to delay approval of his (Shavers') site plan, that would not prove that the Planning Commission as a whole acted out of racial animus.[11] *See Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 262 (6th Cir. 2006) (concluding that the improperly motivated votes of a board's individual members establish that the board acted based on an improper motivation only where there "improperly motivated members supply the deciding margin"); *see also Smith v. Gavulic*, No. 15-10288, 2017 WL 131557, at *15 (E.D. Mich. 2017) (citing *Scarbrough*, 470 F.3d at 262) ("But even assuming that a reasonable jury could find that [one Board member's] testimony means his vote was improperly motivated, his one vote is not enough to show that the Board itself acted out of a retaliatory motive. This is because [plaintiff] cannot show that an improper motivation stood behind a 'deciding margin' of votes.").[12]

---

[11] Shavers has not contended nor presented evidence that Francis, as Planning Commission Chair, had any special authority – such as setting the agenda, etc. – not enjoyed by the other Planning Commission members. On this record, Francis appears to have been one among equals on the Planning Commission.

[12] *See also Bowen v. Watkins*, 669 F.2d 979, 985 (5th Cir. 1982) ("Liability under § 1983 requires causation, and a single vote is not a cause when the same decision would have been reached without that vote."); *Watson v. Borough of Susquehanna*, 532 F. App'x 233, 236–37 (3d Cir. 2013) ("Because the jury found that [one Council

Second, Shavers has not shown that Francis' alleged private racial hostility seeped into Francis' consideration of Shavers' site plan application. Francis' votes on the matter followed the recommendations of the Planning Commission's retained professional, and Francis voted to approve the plan as soon as the professional recommended approval. Francis also voted to recommend approval of the rezoning of Shavers' property when that matter first appeared on the Planning Commission's agenda (before the site plan approval process began). (*See* 9/13/17 Planning Commission Minutes, ECF No. 15-14, PageID.885.) Under these circumstances, the evidence in the record is insufficient to support a finding that Francis' conduct in connection with Shavers' site plan application was tainted by racial animus.

## B

The Court next turns to Shavers' claim that the delays in approving his site plan violated his right to substantive due process. That claim fails as a matter of law because Shavers has not presented sufficient evidence that Defendants' actions were arbitrary or capricious.

"Substantive due process 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement

---

member] was the only Council member who acted for an impermissible purpose, and the votes of a majority of Council members are required to terminate [plaintiff], [the one Council member's] vote alone cannot establish the causal link between [plaintiff's] protected activity and her termination.").

them.'" *Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 933 (6th Cir. 2019) (quoting *EJS Props.*, 698 F.3d at 855). "A plaintiff alleging a substantive due process violation resulting from a zoning decision must show 'that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action.'" *Id.* at 934 (quoting *EJS Props.*, 698 F.3d at 855). An arbitrary and capricious decision is one that "is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Johnson v. Morales*, 946 F.3d 911, 933 (6th Cir. 2020) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992)). In the zoning context, this means that "a court should 'not interfere with local zoning decisions unless the locality's action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare.'" *Tollbrook*, 774 F. App'x at 933–34 (quoting *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008)); *see also Norton v. Vill. of Corrales*, 103 F.3d 928, 933 (10th Cir. 1996) ("[F]ederal courts do not sit as a zoning board of appeals to resolve municipal zoning disputes." (quotations and alterations omitted)).

For all of the reasons explained above in the Court's analysis of Shavers' equal protection claim, he has failed to show that the Planning Commission's

decisions delaying approval of his site plan lacked a rational basis and/or were arbitrary. Those decisions – all supported by the recommendations of Mabery, an outside retained professional – had a sufficient foundation to withstand substantive due process review.

## C

The Court next turns to Shavers' claim that Defendants violated his First Amendment rights by delaying his site plan application in retaliation for his speech. "A claim of First Amendment retaliation requires proof that: '(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between' the first two elements, i.e. 'the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Hartman v. Thompson*, 931 F.3d 471, 484 (6th Cir. 2019) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The denial of a proposed land use may be a sufficient adverse action to support a First Amendment retaliation claim. *See, e.g.*, *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010) ("The denial of the variances directly impacts Plaintiff's ability to conduct her business in the manner of her choosing, which is a threat to her economic livelihood. Therefore, this action alone is probably sufficient to state a claim of retaliation inasmuch as the possibility of a zoning variance or a signage variance

necessary for operating a business as planned would deter a person of ordinary firmness from exercising First Amendment rights.").

Shavers argues that he has established all three elements of a retaliation claim. First, he says he engaged in protected conduct by appearing "before the Planning Commission" and "protesting the delay of his application." (Resp., ECF No. 15, PageID.718.)  Second, he says that the Planning Commission took adverse action against him with "the continued delays in securing approvals, which led him to lose business opportunities." (*Id.*)  Third, he alleges that Lloyd's email noting that Shavers "is in deep trouble with the Township" demonstrates that the delays were "motivated by [his] protected conduct." (*Id.*, PageID.718–719.)  The Township counters that "[t]here is no evidence in the record that the Planning Commission's reviews and decisions were motivated in any way by Plaintiff's exercise of protected conduct in appearing at Planning Commission meetings and advocating for approval of his site plan." (Mot. for Summ. J., ECF No. 11, PageID.364.)  The Court agrees with the Township.

While there is evidence that the Planning Commission and Lloyd objected to Shavers' premature commencement of construction, there is no evidence that they objected to, or had any issue whatsoever with, Shavers' presentations to the Planning Commission.  Nor is there any evidence that Shavers' statements played any role in the Planning Commission's decision to delay approval of his plan.  As described in

detail above, every one of the Planning Commission's decisions concerning Shavers' proposed plan followed a recommendation by Mabery.

At the hearing before the Court, Shavers' counsel agued that the temporal proximity between Shavers' speech (opposing the decisions to delay approval) and Defendants' adverse action (delaying the vote to approve the plan) was sufficient to allege retaliation. Shavers is correct that "[t]emporal proximity between the protected activity and the adverse action can support a causal connection." *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019). But the temporal proximity between Shavers' speech and the Planning Commission's decisions has *de minimis* probative value because it was *inherent* in the application process. Indeed, every time Shavers' application appeared on the Planning Commission's agenda, the Planning Commission *had* to take *some* action: approve, deny, or delay a final vote pending revisions to the plan. Under these circumstances – where the challenged action *necessarily* follows immediately after the protected conduct – temporal proximity, standing alone, is not enough to satisfy the causation element of a First Amendment retaliation claim. And since Shavers has no other evidence of causation, his First Amendment retaliation claim fails as a matter of law.

## D

Finally, the Court turns to Shavers' state-law gross negligence claim against Lloyd. She is entitled to statutory immunity from that claim.

As a governmental employee, Lloyd is "statutorily entitled to governmental immunity by reason of [Michigan's] governmental tort liability act (GTLA), MCL 691.1401 *et. seq.*" *Tarlea v. Crabtree*, 687 N.W.2d 333, 335 (Mich. Ct. App. 2004). But the immunity she enjoys does not cover "conduct" that "amount[s] to gross negligence that is the proximate cause of [a claimed] injury or damage." Mich. Comp. Laws § 691.1407(2)(c). In this context, "the proximate cause" means "the one most immediate, efficient, and direct cause of the injury." *Ray v. Swager*, 903 N.W.2d 366, 372 (Mich. 2017) (quotation omitted).

Shavers contends that Lloyd proximately caused the delays in the approval of his site plan by misadvising him that he could begin construction of his pole barn before obtaining site plan approval. (*See* Resp., ECF No. 15, PageID.720–722.) He suggests that Lloyd's bad advice "put [him] at risk of denial" by the Planning Commission. (*Id.*, PageID.721.) There are at least two problems with this theory of proximate causation.

First, it fails to account for Shavers' own statements to the Planning Commission. Shavers told the Planning Commission that he decided to start construction without a permit due to his own "misunderstanding" that he could start early before the weather turned colder. (12/11/17 Shavers Apology Letter, ECF No. 1-13, PageID.149; 12/13/17 Planning Commission Minutes, ECF No. 1-16, PageID.170.) There is no indication that Shavers ever told the Planning Commission

that Lloyd authorized him to begin construction without site plan approval. Shavers' own acceptance of full responsibility before the Planning Commission – rather than any misadvice by Lloyd – led to the Planning Commission's frustration with Shavers.

Second, even if Lloyd's alleged bad advice caused the Planning Commission to be frustrated with Shavers, there is no evidence that that frustration led the Planning Commission to delay approval of Shavers' plan. As described above, the Planning Commissioners expressed their frustration with Shavers' premature start of construction only once and voted to delay Shavers' plan at that time because it was lacking essential information and because Mabery recommended against approval. As further described in detail above, the Planning Commission's later decisions to delay approval of Shavers' plan followed Mabery's recommendations, and Shavers has not presented any evidence that the decisions were based upon his commencement of construction. Simply put, Shavers has not submitted evidence sufficient to support a finding that Lloyd's advice was "the one most immediate, efficient, and direct cause" that delayed approval of his plan, and thus Lloyd is entitled to statutory immunity from Shavers' state-law gross negligence claim.

# IV

For all of the reasons described above, the Court **GRANTS** Defendants'

Motion for Summary Judgment (ECF No. 11).

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 2, 2020


I hereby certify that a copy of the foregoing document was served upon the
parties and/or counsel of record on March 2, 2020, by electronic means and/or
ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764